**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| TERESA MACMARTIN, an individual, ) | CASE NO.: _____ |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **COMPLAINT** |
| ) | |
| MARINE MANAGEMENT SERVICES, ) | |
| INC., a corporation; CROWLEY ) | |
| PERSONNEL, LLC, a limited liability ) | |
| company; FUGRO ENTERPRISE, INC., a ) | **DEMAND FOR JURY TRIAL** |
| corporation, ) | |
| Defendants. ) | |
| ) | |
| ) | |
| _____ ) | |

Plaintiff, Teresa MacMartin (hereinafter "Plaintiff" or "MacMartin"), brings this action against Defendants, Marine Management Services, Inc. ("MMS"); Crowley Personnel, LLC ("CP") (collectively with MMS, "Crowley"); and Fugro Enterprise, Inc. (("Fugro") (collectively with Crowley, "Defendants"), and alleges as follows:

**NATURE OF THE ACTION**

1.      Crowley claims it "built [its] name on doing what is right," and that it "foster[s] workplaces and teams where employees feel at home in a global company that exposes them to different people and experiences."  *See* Crowley website, https://www.crowley.com/culture/. Similarly, Fugro also purports to "create a safe and respectful environment where everyone feels able to speak up, be heard and make Fugro a safe place to work."  *See* Fugro website, https://www.fugro.com/about-fugro/group-overview/our-values.  As Fugro puts it, "[d]oing what's right isn't always easy, but it's the Fugro way."  *Id.*  Despite the expression of these high-

1

minded ideals, Defendants' actions toward MacMartin prove that these statements are utter misrepresentations of the environment MacMartin had to work in.

2.      MacMartin, an employee of Defendants on a 170-foot-long ship, did not feel "at home," "safe" or "respect[ed]" during her brief period of employment with them.

3.      In fact, when MacMartin tried to speak up about the repeated, unsolicited sexual harassment she endured by a male crew member, she not only received dismissive responses from her supervisors, but was also berated by her superior, who called her "petty and unprofessional" and told her to "just get over it."

4.      Despite having knowledge of the ongoing harassment, Defendants refused to thoroughly investigate and take adequate remedial actions to prevent its occurrence and improve the conditions for MacMartin on the vessel.

5.      Moreover, although MacMartin had signed an agreement of a rotation of six weeks on and six weeks off the vessel, once she completed her first assignment, Defendants did not call her back within the agreed-upon, six-week timeframe.

6.      Even worse, when MacMartin understandably requested she not be placed on the same vessel as her harasser for future assignments, Defendants refused to provide her with such assurances.

7.      Defendants gave MacMartin an impossible choice: to accept a position that would force her to live within very close quarters to her harasser, and be in constant fear of physical harm for another six weeks, or lose her job.  Defendants' actions amounted to constructive termination.

8.      Accordingly, MacMartin brings this lawsuit to, among other things, change Defendants' culture of sex/gender discrimination and hold them accountable for their misconduct as alleged herein.

9.      MacMartin asserts the following six claims: (1) harassment based on sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"); (2) retaliation based on sex, in violation of Title VII; (3) harassment based on, sex in violation of Florida Civil Rights Act of 1992, Fla. Stat. 760.10, *et. seq.* ("FCRA"); (4) retaliation based on sex, in violation of the FCRA; (5) violation of the Jones Act, 46 U.S.C. § 30104, *et seq.* ("Jones Act"); (6) Maintenance and Cure; and (7) breach of contract.

10.      MacMartin seeks to recover economic, non-economic, compensatory, and punitive damages, injunctive relief, interest, and attorneys' fees and costs, as well as all other relief presently available statutorily and/or under applicable law.

## JURISDICTION AND VENUE

11.      Plaintiff brings this action pursuant to Title VII, the FCRA, the Jones Act, and general maritime law.

12.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343, based on federal questions and the federal civil rights violations alleged herein.

13.      The Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a), as such claims arise out of the same case or controversy as Plaintiff's federal law claims.

14.      Venue is proper in this District under 28 U.S.C. § 1391 because one or more of the named Defendants reside, transact business, or have offices in this District, and some of the acts and omissions alleged herein also took place in this District.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

15.     On May 13, 2021, MacMartin submitted a Charge of Discrimination with the Florida Commission on Human Relations ("FCHR") and the U.S. Equal Employment Opportunity Commission ("EEOC") against Defendants (EEOC Charge Nos. 510-2021-04222 and 510-2021-04223).  On March 23, 2022, the EEOC issued MacMartin its Determination and Notice of Rights ("Notice of Right to Sue").

16.     Accordingly, Plaintiff has exhausted her administrative remedies, including timely filing her complaint with the FCHR and EEOC and filing her claim in this District within 90 days of receiving the Notice of Right to Sue.

## PARTIES

17.     Plaintiff is an adult woman, a U.S. citizen, and a resident of Springfield, Missouri. She was employed by Defendants on or around November 10, 2020, until she was constructively terminated in or around March 2021.

18.     MMS is a Delaware corporation with its principal place of business in Jacksonville, Duval County, Florida.   MMS purports to be a marine staffing company that provides marine and offshore crewing, personnel recruitment, and project support to companies worldwide.

19.     CP is a Delaware corporation with its principal place of business in Jacksonville, Duval County, Florida.  CP purports to be a payroll company for MMS.

20.     Fugro is a Delaware corporation with its principal place of business in Houston, Texas, and offices in several locations, including one in Gainesville, Alachua County, Florida. Fugro purports to be the world's leading geo-data specialist, collecting and analyzing comprehensive information about the Earth and the structures built upon it.

## FACTUAL ALLEGATIONS

**A.     MacMartin's Employment and Agreement with Defendants**

21.     On or about November 10, 2020, MacMartin executed a Crewmember

Employment Agreement (the "Agreement") with Crowley to work on a vessel named, "Fugro

Enterprise" (the "Vessel"), owned and operated by Fugro, as a "Second Cook."

22.     MacMartin's pay slip further reflected her work location was Jacksonville,

Florida (at sea).

23.     As Second Cook, her job duties included cooking and baking during the night

shift, typically for the midnight meal and breakfast, along with washing dishes, cleaning and

sanitizing the tables and countertops, and generally keeping the galley and mess in order.

24.     The Agreement provided that MacMartin would work a continuous rotating

schedule on the Vessel: six weeks on and six weeks off.

25.     The Agreement provided that "[s]exual or any other form of harassment," was

"expressly prohibited and [are] grounds for termination."

26.     The Agreement also explained that:

> If you are on a voyage at the time that you become sick or injured, you will be
> paid your normal basic remuneration until you have been repatriated.  You will be
> provided with any medical care on-board should that become necessary, free of
> charge, including access to necessary medicines, medical equipment and facilities
> for diagnosis and treatment and medical information and expertise. Where
> practicable and appropriate, you will be given leave to visit a qualified medical
> doctor or dentist in ports of call for the purpose of obtaining treatment.

27.     The Agreement also directed MacMartin to abide by Fugro's standards and

policies and to "notify [Fugro's] Captain/Master or other crewmember in charge regarding . . .

injury suffered by him/her while employed . . . ."

28.    Accordingly, at all relevant times herein, Defendants had significant control and supervision over MacMartin, and thus, were her joint employers.

29.    Other than the Agreement, MacMartin was not provided an employee handbook and/or manual that discussed reporting requirements and procedures to guide her on how to file a complaint with Defendants.

**B.    Defendants Knew MacMartin Was Being Harassed, Yet Refused to Take Adequate Remedial Actions**

30.    On or around November 10, 2020, MacMartin embarked on the Vessel, which would be her home for the next six weeks, off the coast of New Jersey and New York.

31.    The Vessel consisted of around 20 crew members, and MacMartin was only one of three or four women on the Vessel.  In fact, MacMartin was the *only* woman working as one of the ship's marine crew, which was the part of the crew that handled the Vessel operations.

32.    The other two or three women were part of the surveying crew, who observed the marine life while onboard, and rarely interacted with MacMartin or the other marine crew members.  The different crews were not expected to intermingle and MacMartin was not regularly exposed to people outside of the marine crew, especially given that she worked the night shift.

33.    On November 15, 2020, after only five days on the Vessel, MacMartin encountered Neil Bennett ("Bennett"), an able-bodied seaman of Fugro, under alarming circumstances.

34.    Bennett was staying in a cabin that was connected to MacMartin's cabin through a shared restroom, to which both of them had access.

35.    As part of her job duties, MacMartin was mostly confined to the galley, which was a tight kitchen area of the Vessel that could barely fit four people comfortably.  In addition

to already being a small space, the galley had large steel appliances lined up on the walls and a single entry that led directly to a little open standing area where MacMartin would cook and clean during her shift.

36.     In one instance, while MacMartin was alone working in the galley at night, Bennett walked in and fully unzipped his trousers right in front of her.

37.     Shocked and trapped in the small quarters, MacMartin immediately turned away as Bennett laughed and claimed he was "just adjusting" his shirt.

38.     Shortly after, the Chief Engineer of the Vessel and Bennett's supervisor, Robert Falcone ("Falcone"), entered the galley.  Per the Agreement, MacMartin immediately reported the matter to Falcone.

39.     After MacMartin explained to him what had happened, Falcone simply told Bennett to "not do that."

40.     The next night, on or about November 16, 2020, Bennett continually came in and out of the galley while MacMartin worked, for no specific reason.  At last, Bennett approached MacMartin in the galley while she was at the sink washing dishes, placed his hand on her back, and stood so close to her that she could feel his breath on her face.

41.     Pinned to the sink, MacMartin believed Bennett was attempting to kiss her, until he abruptly cried out, "Great biscuits! Great biscuits!" and walked off.

42.     Again, MacMartin immediately reported the incident, this time to the Captain of the Vessel, Eddie Poindexter ("Captain Poindexter"), who admitted that Bennett had no sense of personal boundaries but also seemed to indicate that this excused his harassment of Plaintiff.

43.     Captain Poindexter then agreed that Bennett's behavior was unacceptable and told MacMartin to write a "formal" complaint, which was to be given to his second-in-command,

Falcone, and that she should contact the Ship Superintendent of the Vessel, Bruce Grimball ("Grimball").

44.     Per Captain Poindexter's directions, MacMartin wrote a formal complaint and submitted it to Falcone.

45.     After giving Falcone her formal complaint, Plaintiff further expressed her fear about living next to Bennett and sharing a restroom with him.  But instead of moving Bennett to an entirely different cabin away from MacMartin, Fugro installed a barrel bolt on the inside of Plaintiff's cabin.

46.     However, the barrel bolt did little to soothe MacMartin's fears while she was in a space that was supposed to be private and safe.  In fact, it merely put the onus on MacMartin to fend for herself and ensure that she keep the door locked (which she did at all times when she was not in the restroom).  Installing the barrel bolt was meant to placate MacMartin and sent a message that, if something did happen, she would only have herself to blame.

47.     Despite the barrel bolt, the restroom doors were thin enough to hear what was happening on the other side.  On several occasions, while MacMartin was using the restroom, Bennett made obscene and disturbing noises, such as snorting like a pig, outside the restroom door in an attempt to intimidate and taunt her.

48.     Furthermore, the restroom locks were flimsy and could easily pop open, so Bennett could still come into the shared restroom while MacMartin was in it.

49.     With essentially one door separating MacMartin from Bennett, there was nowhere MacMartin could feel truly safe while aboard the Vessel.

50.     Fugro also switched Bennett's shift so he was working the opposite shift of MacMartin, but that did not stop him from persistently harassing MacMartin nearly every day on the Vessel.

51.     Bennett, who was much larger than MacMartin, would continue to menacingly hover around MacMartin, stare at her for four to five minutes at a time, and make other countless microaggressions in an attempt to assert his power over her.

52.     For example, once Bennett coughed on everything in the entire mess area, knowing that one of MacMartin's job was to keep everything sanitized to comply with COVID-19 protocol and that his actions would require her to perform additional work.

53.     Additionally, when MacMartin and Bennett had to be in the mess together, MacMartin would regularly sit in a spot that was as far away from Bennett as possible.  In response, on occasion, Bennett would deliberately sit at MacMartin's usual spot in an attempt to assert his dominance and signal that she would not be able to truly escape him while they were both on the Vessel.

54.     On November 17, 2020, BreAnn Hanenkrat, the assistant to MacMartin's direct supervisor at Crowley, texted MacMartin to check in on her and, in response, MacMartin explained that she was being harassed by Bennett on the Vessel, but that she believed Captain Poindexter was handling it.

55.     MacMartin never received a response or a follow-up to that text; indeed, that was the last she ever heard from Crowley throughout the entire six weeks she was on the Vessel.

56.     On December 5, 2020, Plaintiff again complained to Captain Poindexter, this time via email, letting him know that Bennett was still harassing her.

57.    In response, Captain Poindexter told MacMartin to call the Ship Superintendent, Grimball.  However, when she called Grimball on December 7, 2020 to express her concerns over Bennett's incessant harassment, Grimball yelled at her, called her "petty and unprofessional" and told her to "just get over it."

58.    After being berated by Grimball, MacMartin felt like she could no longer "speak up" and seek help from Defendants.

59.    As a result, Plaintiff lived in constant fear of physical harm by Bennett for the remainder of the voyage.  Her sense of vulnerability was heightened by the lack of a safe living space where she had complete protection from Bennett, given the shared restroom linking her living quarters to his and the tight quarters in general aboard the Vessel.

60.    As a result of her fears, MacMartin frequently slept less than three hours a night.

61.    On December 22, 2020, the Vessel finally docked and the crew, including MacMartin and Bennett, left the ship.  Also on December 22, 2020, MacMartin contacted Fugro's Human Resources Department ("HR").

62.    Fugro's HR took MacMartin's name, phone number, and a copy of the written statement that she had previously submitted and told her that someone would get back to her by January 4, 2021.  Despite HR's assurances, MacMartin never received any follow up from Fugro.

63.    Despite knowledge of the harassment, Defendants refused to take adequate remedial actions to prevent and correct the harassment.

64.    Defendants failed to investigate once they were notified about Bennett's harassment by Plaintiff.

65.    None of the managers took the time to speak with MacMartin on the Vessel regarding her complaints, unless prompted by MacMartin herself.

66.    MacMartin was never told of any formal disciplinary action taken against Bennett.

67.    As a result of the harassment she endured, MacMartin suffered, and continues to suffer, from anxiety, nausea, breathing difficulties, and insomnia.

68.    Despite knowledge of the harassment and its effect on MacMartin, Defendants did not provide any medical care on-board or give her access to necessary medicines, medical equipment and facilities for diagnosis, treatment, medical information and/or expertise.

69.    Moreover, MacMartin was never offered the opportunity to leave the Vessel to visit a qualified medical doctor for the purpose of obtaining treatment related to the effects of the harassment she was forced to endure.

70.    MacMartin also felt she could not voluntarily leave the Vessel because she would be risking her employment and would have to personally cover the costs to travel home to Missouri.

**C.    Defendants Constructively Terminate MacMartin By Refusing to Offer Her a Position Where She Could Work in a Safe Environment**

71.    On December 29, 2020, MacMartin emailed Lisa Haynie ("Haynie"), her direct supervisor at Crowley, and reminded Haynie about the harassment she endured throughout her time on the Vessel, and further asked when her next assignment would be.  MacMartin did not receive a response to her email.

72.    On January 21, 2021, MacMartin received a confusing email from Fugro, which stated that it no longer needed a person to fill an employment position with the company, and

that it would no longer consider her application.  However, MacMartin never directly applied for a job with Fugro.

73.     That afternoon, Plaintiff reached out to Crowley and requested a copy of her Agreement to understand why she received the termination email from Fugro.  Crowley provided MacMartin with a copy of the Agreement.

74.     Immediately thereafter, Haynie reached out to MacMartin and scheduled a call.

75.     At the end of January 2021, MacMartin spoke to Haynie on the phone.  During the call, Haynie informed MacMartin that there was a potential job for her on the Vessel, but the earliest the Vessel would depart was March 1, 2021, which was much later than what MacMartin had expected because, based on her Agreement, she should have been back on board on or around February 2, 2021 (*i.e.,* six weeks after she disembarked the Vessel on December 22, 2020).

76.     After what she endured on the Vessel, MacMartin informed Haynie she would only be interested in a position on the Vessel if she could be assured that Bennett would not be on board again.

77.     MacMartin did not hear back from Defendants and, as a result, on March 1, 2021, approximately ten weeks after she disembarked, she followed up again regarding her next assignment.

78.     In response, Haynie informed MacMartin that the Vessel was still in the shipyard and offered her jobs within its union sector as an alternative to her Second Cook position; however, MacMartin declined those positions because they were not what she had previously agreed upon.

79.     MacMartin was not a union member and had no interest in becoming one because of the union dues and her prior negative experiences with unions, specifically with Crowley several years earlier.  MacMartin also heard that Crowley did not have a good reputation for its union jobs; consequently, she did not view these union positions as equivalent to the job she was originally employed to do.

80.     On March 7, 2021, Crowley reached out to MacMartin regarding a position on the Vessel, but could not provide her with any assurances that Bennett would not be on board.  As a result, MacMartin declined the position.

81.     Defendants' refusal to offer MacMartin a position where she could work in a safe environment constituted constructive termination.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Harassment Based on Sex**
**(Title VII of the Civil Rights Act of 1964,**
**42 U.S.C. § 2000(e), *et seq*.)**

82.     Plaintiff incorporates by reference the allegations in all preceding paragraphs.

83.     MacMartin is a woman and, as such, a member of a class protected under Title VII.

84.     Defendants, as joint employers, are covered employers under Title VII because each Defendant employed 15 or more persons.

85.     On a continuing basis since at least November 2020, Bennett subjected MacMartin to unwelcome conduct related to her sex.

86.     The harassment suffered by Plaintiff was based on her sex.

87.     The effect of the harassment was so sufficiently severe and pervasive that it had the purpose and effect of unreasonably interfering with her work environment and/or creating an intimidating, hostile or offensive work environment.

88.     The harassment complained of above forms the basis for imputing liability on Defendants because they:

        a.      failed to provide Plaintiff with employment conditions and relationships where she could safely work, free from sexual harassment and discrimination;

        b.      failed to respond promptly to Plaintiff's complaints of sexual harassment and discrimination;

        c.      failed to thoroughly investigate Plaintiff's complaints of sexual harassment and discrimination;

        d.      failed to take appropriate action when they knew or should have known of the sexual harassment and discrimination;

        e.      failed to discharge, suspend, reprimand or otherwise adequately and effectively discipline the harassing crew member, Bennett, who perpetuated the sexual harassment, thereby acquiescing and/or ignoring his behavior; and

        f.      failed to disseminate and enforce its sexual harassment policy to its management, staff and employees.

89.     As a direct and proximate result of said unlawful employment practices and blatant disregard for Plaintiff's rights and sensibilities, Plaintiff has lost and will continue to lose substantial income, including, but not limited to, front pay and loss of employment benefits.

90.     As a result of the discrimination, harassment and unlawful employment practices complained of above, Plaintiff has suffered emotional distress, including, but not limited to, anxiety, nausea, breathing difficulties, and sleep loss.

**SECOND CLAIM FOR RELIEF**
**Retaliation/Retaliatory Harassment**
**(Title VII of the Civil Rights Act of 1964,**
**U.S.C. § 2000(e), *et seq.*)**

91.     Plaintiff incorporates by reference the allegations in all preceding paragraphs.

14

92.     MacMartin is a woman and, as such, a member of a class protected under Title VII.

93.     Defendants, as joint employers, are covered employers under Title VII because each Defendant employed 15 or more persons.

94.     Plaintiff, at all times material hereto, undertook protected conduct when she complained to Defendants about the unwanted harassment by Bennett, as outlined above.

95.     Defendants knew or should have known that Plaintiff was exercising her civil rights in making her complaint.

96.     Defendants took adverse employment action against Plaintiff by calling her "petty and unprofessional" for complaining about the harassment she endured and by failing to recall her to work or offer her a position in which she would be able to work in a safe environment.

97.     Defendants caused Plaintiff to be constructively discharged by failing to respond, investigate, protect or take timely and appropriate action in response to the sexual harassment which Plaintiff was subjected to, when they knew or should have known of the conduct.

98.     The adverse employment actions were causally related to Plaintiff's engagement in a protected activity in opposing and making complaints of sexual discrimination, harassment, and a hostile work environment.

99.     As a direct and proximate result of said unlawful employment practices and blatant disregard for Plaintiff's rights and sensibilities, Plaintiff has lost and will continue to lose substantial income, including, but not limited to, front pay and loss of employment benefits.

100.    As a result of the discrimination, harassment and unlawful employment practices complained of above, Plaintiff has suffered emotional distress, including, but not limited to, anxiety, nausea, breathing difficulties, and sleep loss.

**THIRD CLAIM FOR RELIEF**
**Discrimination and Harassment Based on Sex**
**(Violation of the Florida Civil Rights Act**
**of 1992, Fla. Stat. 760.10, *et seq.*)**

101.    Plaintiff incorporates by reference the allegations in all preceding paragraphs.

102.    MacMartin is a woman and, as such, a member of a class protected under FCRA.

103.    Defendants are joint employers within the meaning of the FCRA.

104.    On a continuing basis since at least November 2020, Bennett subjected

MacMartin to unwelcome conduct related to her sex.

105.    The harassment suffered by Plaintiff was based on her sex.

106.    The effect of the harassment was so sufficiently severe and pervasive and had the

purpose and effect of unreasonably interfering with the work environment and/or creating an

intimidating, hostile or offensive work environment.

107.    The harassment and unlawful employment practices complained of above form

the basis for imputing liability on Defendants because they:

      a.     failed to provide Plaintiff with employment conditions and relationships in which she could safely work, free from sexual harassment and discrimination;

      b.     failed to respond promptly to Plaintiff's complaints of sexual harassment and discrimination;

      c.     failed to thoroughly investigate Plaintiff's complaints of sexual harassment and discrimination;

      d.     failed to take appropriate action when they knew or should have known of the sexual harassment and discrimination;

      e.     failed to discharge, suspend, reprimand or otherwise adequately and effectively discipline the harassing crew member, Bennett, who perpetuated the harassment, by acquiescing and/or ignoring the sexual harassment or discrimination; and

      f.     failed to disseminate and enforce the sexual harassment policy to their management, staff and employees.

108.     As a direct and proximate result of said unlawful employment practices and blatant disregard for Plaintiff's rights and sensibilities, Plaintiff has lost and will continue to lose substantial income, including, but not limited to, front pay and loss of employment benefits.

109.     As a result of the discrimination, harassment and unlawful employment practices complained of above, Plaintiff has suffered emotional distress, including, but not limited to, anxiety, nausea, breathing difficulties, and sleep loss.

## FOURTH CLAIM FOR RELIEF
### Retaliation/Retaliatory Harassment
### (Violation of
### the Florida Civil Rights Act
### of 1992, Fla. State. 760.10, *et seq.*)

110.     Plaintiff incorporates by reference the allegations in all preceding paragraphs.

111.     MacMartin is a woman and, as such, a member of a class protected under the FCRA.

112.     Defendants are joint employers within the meaning of the FCRA.

113.     MacMartin, at all times material hereto, undertook protected conduct when she complained to Defendants about the unwanted harassment by Bennett, as outlined above.

114.     Defendants knew or should have known that Plaintiff was exercising her civil rights in making her complaint.

115.     Defendants took adverse employment action against Plaintiff by calling her "petty and unprofessional" for complaining about the harassment and failing to genuinely recall her to work or offer her a position in which she would be able to work in a safe environment.

116.     Defendants caused Plaintiff to be constructively discharged by failing to respond, investigate, protect, or take timely and appropriate action in response to the sexual harassment Plaintiff was subjected to, when they knew or should have known of the conduct.

117.    The adverse employment actions were causally related to Plaintiff's engagement in protected activity in opposing and making complaints of sexual discrimination, harassment, and a hostile work environment.

118.    As a direct and proximate result of said unlawful employment practices and blatant disregard for Plaintiff's rights and sensibilities, Plaintiff has lost and will continue to lose substantial income, including, but not limited to, front pay and loss of employment benefits.

119.    As a result of the discrimination, harassment and unlawful employment practices complained of above, Plaintiff has suffered emotional distress, including, but not limited to, anxiety, nausea, breathing difficulties, and sleep loss.

### FIFTH CLAIM FOR RELIEF
**(Personal Injury)**
**The Jones Act**

120.    Plaintiff incorporates by reference the allegations in all preceding paragraphs.

121.    At all relevant times herein, Plaintiff was a seaman because she was an individual engaged or employed as a Second Cook on board the Vessel.  *See* 46 U.S.C. § 10101.

122.    At all relevant times herein, Plaintiff was a seaman in the service of the Defendants and, thus, within the purview of the Jones Act.

123.    It was the duty of Defendants to provide MacMartin with a safe place to work, including a safe place to reside abroad the Vessel.

124.    While aboard the Vessel, Plaintiff suffered emotional and psychological distress in the course of her employment.

125.    Defendants breached their duty of care when they became aware that MacMartin had been harassed, and continued to be harassed, and failed to make an effort to thoroughly investigate or remedy the situation.

126.   In fact, once Plaintiff notified Defendants of the harassment, they berated her for complaining, calling her "petty and unprofessional," and thereafter failed to offer her assignments she was entitled to under the Agreement.

127.   Because Defendants refused to take adequate remedial actions to prevent the harassment from occurring and improve the condition on the Vessel, Plaintiff feared an immediate risk of physical harm by the harasser – who was sleeping next door to her – the entire time she was aboard the Vessel.

128.   As a direct and proximate cause of Defendants' negligence, MacMartin suffered, and continues to suffer, emotional and psychological distress, including physical manifestation of such distress, including, but not limited to anxiety, nausea, breathing difficulties and insomnia, which developed while she worked on board of the Vessel.

129.   Defendants failed to provide MacMartin with the necessary medical care and attention she needed.

## SIXTH CLAIM FOR RELIEF
### Maintenance and Cure

130.   Plaintiff incorporates by reference the allegations in all preceding paragraphs.

131.   At all relevant times herein, Plaintiff was a seaman because she was an individual engaged or employed in any capacity on board the Vessel.  *See* 46 U.S.C. § 10101.

132.   Plaintiff was injured while she was on the Vessel during her employment. Specifically, she suffered and continues to suffer emotional and psychological distress, including physical manifestations of such distress; for example, anxiety, nausea, breathing difficulties, and insomnia, which developed while she worked on board the Vessel as a result of the harassment she endured on the Vessel.

133.   Defendants failed to provide Plaintiff with the necessary medical attention and care she needed, resulting in a breach of duty to provide maintenance and cure.

## SEVENTH CLAIM FOR RELIEF
### Breach of Contract

134.     Plaintiff incorporates by reference the allegations in all preceding paragraphs

135.     Plaintiff and Defendants entered into a valid and binding contract.

136.     Plaintiff substantially performed all of her duties and obligations under the

contract, including by providing services as a Second Cook to Defendants.

137.     In return, Defendants made specific promises to Plaintiff, including:

     a.     Paying her normal basic remuneration until she has been repatriated if she becomes sick or injured on the voyage;

     a.     Rotating her six weeks on the job and six weeks off;

     b.     Providing medical care on-board should that become necessary, free of charge, including access to necessary medicines, medical equipment and facilities for diagnosis and treatment and medical information and expertise; and

     c.     Giving her leave to visit a qualified medical doctor for the purpose of obtaining treatment.

138.     Defendants breached their Agreement with Plaintiff by failing to perform

the contractual duties and obligations described above.

139.     As a direct and proximate result of Defendants' conduct, Plaintiff suffered

injuries and damages in amounts to be determined at trial

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

     a.     For all actual, consequential and incidental financial losses, including, but limited to, loss of earnings, employment benefits, and employment opportunities according to proof;

     b.     For injunctive relief;

     c.     For statutory pre-judgment and post-judgment interest on any amounts;

     d.     For payment of reasonable attorneys' fees and recoverable litigation expenses as may be allowable under applicable law;

     e.     For punitive damages;

     f.     For emotional distress;

g.      For compensatory damages; and

h.      For such other relief as the Court may deem just and proper.

### **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

/s/ *Nathan C. Zipperian*
Nathan C. Zipperian
MILLER SHAH LLP
1625 N. Commerce Pkwy, Suite 320
Fort Lauderdale, FL 33326
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: nczipperian@millershah.com

21